BREAUX, C. J.
Plaintiff brought this suit to recover damages to the amount of $14,400.
The judge of the district court allowed him $5,349.79 of that amount.
Defendant appealed.
The ground of plaintiff’s complaint is that defendant violated its contract.
The contract is dated July 10, 1907.
Jones, the plaintiff, bound himself to furnish the defendant with cross-ties to the amount of 200,000 for which he was to receive for each tie 28 cents.
He signed the contract, and under his name wrote “Land & Lumber Company,” although there was no such company in existence.
He had contemplated the organizing of a company to deal in and make railroad ties.
There was no such company existing to the knowledge of all parties concerned.
He represents that during September, October, and November, 1907, he shipped 20,000 ties on account, for which he was paid; that all the remittances were made to him personally by checks payable to his order.
He also represents that during the time the ties maintained their value — that is, up to November, 1907 — the defendant acted under the contract, but that in the following December, the price of ties having fallen, the defendant sought to put an end to the' contract, and refused to continue with the contract.
The plaintiff declined, he said, to be governed by defendant’s wish to cancel the contract, but that he could not force the defendant to accept his ties.
He avers that he could easily have delivered the 180,000 ties due on the contract if he bad been permitted to continue with his work.
Plaintiff’s claim is that he is entitled to the benefit of the contract to the amount which he would have recovered if he had not been stopped by defendant’s refusal to accept more ties.
The propositions of the defense in answer to plaintiff’s petition are that plaintiff was not known to its officers, but about the 15th day of. July, 1907, he wrote to them and offered to sell ties to the defendant company. They, thinking, as they alleged, that he represented a corporation with capital stock of at least $10,000, entertained his offer to sell ties to them. That they learned that plaintiff was a man of small means, and for that reason they thought that he should organize a company to deal in ties, as in that case he would have some financial standing.
At this time, the plaintiff said to the defendants, as they allege, that he would organize a company, with capital of $10,000, of responsible stockholders. That, relying upon that promise, they consented to deal with him and to enter into a contract to buy a number of ties. That, feeling certain that there would be a company organized, they did not hesitate to contract.
The plaintiff in signing added the name of the contemplated corporation.
The charge by defendant is that, not only the plaintiff did not organize a company as had been understood, but that the plaintiff did not perform his contract as he should have done, and for those reasons the com *599 pany came to the conclusion to set aside the contract entirely.
Statement of Pacts.
The issues are, to an extent, stated in the pleadings. There is no necessity of reiterating many of the facts, except in those respects that plaintiff and defendant materially differ from each other.
The evidence is that plaintiff wrote to defendant’s purchasing agent, offering to sell cross-ties. He was quite profuse in expressions regarding the cross-ties that he would have for sale, and in assuring defendant’s purchasing agent of his ability to supply defendant with the ties needed by it.
He assured defendant’s officers that he would form a company worth $10,000 in order to he better able to carry on the cross-tie business in which he was engaged.
Defendant bodght 200,000 cross-ties from plaintiff at the price before mentioned.
These ties were to be hewed or sawed track ties, first-class quality, square edged, and sound, and payments were to be made in cash, less 2 per cent.
The contract stipulated that all ties were bought subject to defendant’s inspection at its creosoting plant.
It was also stipulated that rejected material would be subject to the immediate disposition of shipper at regular freight rates, and that defendant would take no more care of the material 10 days after rejection of the material.
A few days after the date of the contract, plaintiff wrote the defendant’s officers that he had prepared a charter, which would be published in a few days,' and that the name of the stockholders of the corporation would prove a guaranty in regard to the permanence and responsibility of the corporation and its ability to do all work for which it would bind itself.
About the same time, or a few days afterward, Roach, defendant’s purchasing agent, wrote to plaintiff that he had not received a copy of the charter.
As a witness on cross-examination, plaintiff answered the question:
Q. “Wliat did you mean in your letter of July 27, 1907, 'by the following: T have had our charter prepared and it will be published in a few days, and when you see the real names of the stockholders you will readily understand why it was a good business stroke to do business with me.’ ”
A. “Just what it states there. I did prepare that charter, but we got the same results from another company. That is to say, the end we desired to accomplish was accomplished through another company.”
The foregoing question was propounded by defendant’s attorney on cross-examination to this witness to elicit the fact that plaintiff was aware that defendant had always adhered to the idea that a corporation should be formed with a capital stock of $10,000 and responsible stockholders.
The answer of plaintiff negatived this idea, and said that defendant’s officers must have abandoned the idea as they drew a number of checks to be paid to him personally and did other things which showed that they did not intend to hold him to the necessity of organizing another company.
The plaintiff also stated in his testimony that his agreement with the Davis Bros, was entirely with the company, and that defendant’s officers knew nothing of it and were not in any way concerned.
The defendant, on the other hand, invites attention to the fact that plaintiff transferred the contract between it and himself to the Davis Bros. Company; that they (defendant’s officers) had knowledge of this contract and allowed the Davis Company to execute the contract as the contractor in lieu and place of the plaintiff.
This the plaintiff controverts and says that he became one of the stockholders of the Davis Company; that the shipping was not made by the Davis Company to the de *601 fendant, but that it was made by the stockholders of the Davis Company, consisting of himself and the Davis Bros.; that he became a stockholder of the company in order to execute the contract; that he desired to substitute to the corporation of which he had spoken of forming a stronger corporation; that this company had a larger capital than the one he had spolien of forming would have had.
If it were, as the evidence of defendant seeks to prove, that the contract had been transferred by plaintiff to Davis Bros., as before mentioned, then plaintiff would have had no recourse, as the Davis Company had failed and had gone into bankruptcy and was no longer able to sell the cross-ties and execute contracts.
It remains as a fact that the evidence shows that from September 25, 1907, to the 1st of December following the Davis Bros. •Company executed the contract. It was after that time that their business fell into the hands of a receiver.
Plaintiff’s evidence, on the other hand, •seeks to show that defendant knew nothing of the agreement of the Davis Bros. Company in regard to the contract, and it had no ground of complaint.
Furthermore, while it is true that he had transferred the contract to Davis Bros., as ■contended by defendant, this contract was transferred back to him by the Davis Company. That he was amply able to perform all that was required of him under the terms and conditions of the contract. That this transfer to him was made some time prior to the bankruptcy of Davis Company and of their going into the hands of a receiver.
The evidence shows that, while defendant complained of the ties as not being up to the requirement, it wrote letters to the plaintiff urging him to see to the defects in the ties. They rejected part of these ties, and threatened that they would reject them all, and 'complained of the trouble that the defective ties gave.
It remains as a fact that they never placed the plaintiff in mora prior to their refusal to accept any ties at all.
The refusal was on the ground that plaintiff had promised to form a corporation and had failed, that this promise formed a part and parcel of the contract, and that the failure to keep it justified the defendant in terminating this contract.
There arises on this subject a somewhat difficult question, which will receive attention later in discussing the issues.
There was considerable evidence on the subject of default and as to the value of the ties.
In deciding the issues, other facts will be considered.
Those stated are in the main sufficient for the decision.
As relates to an unsigned copy of the contract annexed to plaintiff’s petition:
The proof is that the contract, copy of which was annexed by plaintiff to his petition, as contended 'by defendant, was not signed by the plaintiff.
From this, defendant argues that plaim tiff’s memory was at fault in an important particular, as a paper was signed, which, as defendant contends, plaintiff denied having received, although he had received the important paper.
As relates to acceptance of the contract:
This ground is not sustained.
True, there was an oversight, a slip of memory, perhaps, as relates to this acceptance, which the evidence explains.
It appears that an unsigned copy of the contract was used by plaintiff instead of the original, which was properly signed.
Now, as relates to the corporation. which plaintiff promised to form and to substitute to himself as contractor:
*603 [1] In this connection, it abundantly appears that plaintiff was, to the knowledge of defendant, the only party bound by the contract.
True, plaintiff signed his name to the contract and below his name added an assumed name of a corporation, which had no existence and represented no company but was entirely fictitious and had about it no indicia of a corporation save an empty name.
All of this wasi known to the defendant.
No point is .made by the defendant of the fact that the contract is null because the plaintiff contracted with it (the defendant) and added the words before mentioned.
The ground is that it was never the intention of defendant to continue with this contract with plaintiff as bound personally, but now insists that, in view of the agreement that this corporation was to be formed, by the failure of plaintiff to form the corporation the contract became absolutely null.
Defendant’s ground in this respect loses its force in presence of the fact that plaintiff agreed with the company, known as the Davis Bros. Company, to execute the contract for account of the plaintiff.
The evidence is that, to the end of obtaining the co-operation of this company, plaintiff became a stockholder for an amount of about $5,000 in stock, which was transferred to him.
The evidence further is that this company was worth about $25,000, and at the time amply able and responsible; that, in executing the contract, it was not done by the company itself, but by plaintiff and two of the stockholders of the corporation named.
These three shipped ties under the contract to defendant from September 25, 1907, to some time in October of the same year, and that not the least objection was made.
But, to return for a moment to plaintiff as a party to this agreement:
The defendant held its right under the contract from him personally; without him, it would not at the beginning have acquired any right at all; there would have been no contractor.
But defendant did contract with him, and the result was that, through his management, personally at one time, and afterwards as a member of the company before referred to (which he substituted to the corporation which he had promised to organize), they supplied defendant with the cross-ties which they had sold and promised to deliver.
At first, defendant wrote inquiringly about the company which the plaintiff had promised to organize; but, in a few days, the corporation seems to have been forgotten by all parties — nothing more was said about it.
There was no objection to all of this, not the least.
There is evidence showing that the defendant really knew nothing about it.
Knowing nothing about it, it urged, and could have urged, no objection.
We do not look upon the promised corporation, which seems to have been lost sight of entirely as part and parcel of the contract into which the parties had entered. It was the merest incident, in which parties lost all interest.
To conclude on this point:
The parties agreed in the terms of the offer and the acceptance, and there was therefore a contract formed. There was no misunderstanding ; it was stipulated, not in well-considered terms, it must be said, that within a time, not stated as to limit, plaintiff was to form a company. The defendant made no objection, and the contract was performed to the number of 20,000 ties, and' other shipments were to be made as instructed by defendant, and in effect waived all objection, and gave its unqualified approval. We do not think the parties should be relieved from the burden of the obligation. *605 The contraetee has not proved that it was impossible for the contractor to perform the contract.
[3] The alleged assignment of the contract:
The defense presents an issue in opposition to the assignment of the contract, and the failure to replace in any way the promise made by plaintiff to organize another company.
We are unable to agree with that view.
We have noted that there was an assignment, and we deduce that it had some effect.
The position of the defendant gives effect to the last view expressed.
That position is that defendant had the right to assume ,that the Davis Company was subrogated to all of the rights of plaintiff, and that plaintiff had no concern in the contract after its assignment.
If that position were maintained, it would release the defendant entirely, for the firm of Davis Company, to which the defendant contends the contract was assigned, went into bankruptcy, and thereby the defendant was relieved from the necessity of considering it as a contractor.
The plaintiff’s contention is that defendant never entered into a contract with this company and knew nothing about his agreement with two of the stockholders to carry out the contract.
The contract was not surrendered at all or mentioned in the insolvency proceedings, for before the company went into the hands of a receiver it was retransferred to plaintiff.
[2] But, leaving this question, it is also contended by defendant that the contract' had terminated because of failure of performance on the part of the plaintiff or the assigns.
It is true that there was failure of performance; the ties were not all that they | should have been; the size was defective; many of them were rejected.
The necessity of culling the good from' the bad gave considerable trouble and annoyance, and there was additional work required to give them the proper size and shape.
It is true that this was at the expense of the plaintiff; but it, none the less, gave some annoyance of which defendant seriously complained.
The defendant had two remedies at hand; one to reject all ties not up to the standard, or to place plaintiff in default.
It adopted neither remedy.
In November following the date of the contract, the defendant wrote to plaintiff not to ship during a time stated; after the expiration of the time, then to ship in car loads as mentioned.
The letter contained expressions which must be considered as having had the effect of putting an end to all cause of complaint.
The way was very clear to resume work under the contract.
Default:
There was no absolute default. The complaint never reached the defaulting stage.
“Default” has a positive meaning and requires determined action on the part of the one who seeks to place another in mora.
This was wanting in this case.
Moreover, if there had been default, it would be waived by the letter of continued acceptance of the contract, referred to above.
About the time that the letter above referred to was written, the tie market had become exceedingly dull. Ties were selling cheap. They could be bought for considerably less than the price stipulated in the contract.
It'was at that time that defendant notified plaintiff that it had determined to put an end to the contract and to ship no more ties.
Plaintiff charges that the motive of the defendant was to set aside a contract under *607 which they were obliged to pay a price, considerably higher than the price of other ties on the market.
No question hut that ties had become cheap; this is amply sustained by the testimony.
As to the motive in terminating the contract — whether it was because the price had very much fallen — that is not susceptible of positive proof.
We leave that point without further comment.
Now, as to the amount of the damages:
It must be said that it is not easy to determine what it should be in view of the conflicting testimony.
Because of the fall in the prices, it seems that plaintiff could have bought ties, prepared and delivered them, under the contract, for not over 25 cents a tie. That left a margin of 3 cents net. The contract price was, as before stated, 28 cents a tie.
Quinn, a witness of that firm, fixed the profit at 3 cents a tie. He said it was a good contract for Jones, and testified about details of the works that create the decided impression that 3 cents a tie profit was not extravagant.
Ties had fallen in value. He would buy them for less in the woods, prepare and ship •them, and cleared^ 3 cents for each tie of the price of 28 cents.
For reasons assigned, it is ordered, adjudged, and decreed that the judgment appealed from be affirmed.